Mr. Freeman for the appellant. Yes, your honor. Good afternoon. Mr. Jacobs for the appellee. Afternoon, your honor. I didn't hear Mr. Jacobs, but could you hear him earlier, Ms. McKee? Yes, Mr. Jacobs. There we go. Can you hear me now, your honor? Yes, thank you. Just a reminder to the council to keep your voices up when speaking. Yes, and to keep your microphone on mute when you're not speaking or when you're not presenting. Very well, Madam Clerk, please open the session. The Honorable, the judges of the United States Court of Appeals for the Eighth Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. Very well, good afternoon. The court has five cases set for argument during this session. Madam Clerk, would you please call the first case for argument? Case number 21-1965 from the Eastern District of Arkansas, Stacey Johnson et al versus Hassa Hutchinson, governor of the state of Arkansas et al. All right, Mr. Freeman, we'll hear from you first. May it please the court, Will Freeman for the appellants. In Arkansas's three drug execution protocol, the second and third drugs are undisputably extremely painful. The critical question is whether the first drug, midazolam, is able to prevent that pain. Appellants presented substantial expert and scientific proof showing that it cannot, and the district court's opinion did not meaningfully address that proof. The district court also failed to grapple with plaintiff's detailed and essentially underbunded proof that execution by firing squad is both feasible and would avert the This court should reverse the district court's clearly erroneous opinion and order the district court to permanently enjoin executions with Arkansas's midazolam protocol. At the very least, this court should vacate the district court's order and remand for additional findings. The legal standard here is the two-prong phase glossop analysis. First, the appellants must show that the midazolam protocol creates a substantial risk of readily implemented and in fact significantly reduces a substantial risk of severe pain. Appellants have met both of those prongs here. With respect to the first prong regarding the midazolam protocol, there's two things at the start that are undisputed. First is that the second and third drugs lead to constitutionally unacceptable amounts of pain. In fact, the Supreme Court has recognized that in its Bay's opinion. The second undisputed fact is that midazolam is not a pain reliever. In other words, it's not an analgesic that can relieve pain like drugs such as narcotics. So the key issue then is whether midazolam can render the inmates unaware of the pain that they are otherwise capable of experiencing. Counsel, isn't midazolam though used in certain medical procedures and doesn't that suggest at least the record below was mixed on whether or not the first drug would prevent pain or at least alleviate the pain from the second two drugs? I'm searching my memory for the record here. Sure, so midazolam is, as you know, used in certain medical procedures. Like coloroscopies, other sort of minor surgical procedures. Is that fair? That's fair, it is, yes. And one of the, I'll point to the two primary benefits of midazolam. First is that it is what's called an anxiolytic. It reduces anxiety. And second is that it can, it interferes with memory formation so that patients don't remember traumatic or painful experiences later. So because of those properties and often in conjunction with other drugs such as narcotics and pain relievers, it can be suitable for use in minor procedures and also in larger procedures in conjunction with other drugs. So the district court did not meaningfully address whether midazolam can render the inmates unaware. The appellants conclusively showed that it cannot and most of that was through evidence that was not available at the preliminary injunction stage. Primarily, that came in through scientific evidence related to the isolated forearm technique. The isolated forearm technique is a research technique that the researchers use to assess whether patients are aware during surgery. What happens is during surgery, patients are typically given a paralytic so that they can't move and interfere with the surgery. During the isolated forearm technique, the researchers place a tourniquet on the arm of the patient so the paralytic doesn't go to their arm. That way during surgery, the researchers are able to speak to the patient and ask them, if you can hear me, close your fingers. And as we showed with screenshots from videos in our brief, in fact, the patients often respond by closing their hand, indicating that they're aware during surgery. The Russell study shows that up to 72% of patients who have been sedated with midazolam remain aware despite having been given midazolam. The Lanasi study, which also looked at the isolated forearm technique, showed that a substantial percentage of patients receiving other anesthetic drugs still may remain aware. In the Sanders study shows that the isolated forearm technique may actually underestimate the percentage of patients that remain aware during surgery because awareness and ability to respond are not exactly the same thing. This might sound counterintuitive or perhaps even horrifying to you, that how could modern medicine accept that nearly three quarters of patients could be aware during surgery? And the distinction goes to exactly the question you were just asking, your honor. During surgery, patients are typically given high-dose pain relievers, such as narcotics. So during these isolated forearm technique studies, we saw the researchers ask them, if you can hear me, close your hand. We saw them close their hand. Are you in pain? Close your hand. And they didn't. That's because they've been given pain relievers, such as narcotics. But that's a key distinction between what's done in a surgical context and the Arkansas pain reliever is part of the Midazolam protocol. Midazolam is injected, and then the second and third drugs indisputably lead to extreme pain. There is no pain reliever on board during these executions. A second key scientific finding that the appellate conclusively showed is that Midazolam has what's called a ceiling effect. This means that after a certain threshold dose of Midazolam, it ceases to have any additional effects. It's not like alcohol. It seemed that that wasn't particularly in dispute, that there was a ceiling effect, but it seemed like it was where it landed. So help me understand where in the record you provided the district court with something that was sufficiently supported as to where that limit really is. Sure. So I'll point you to the Miyake study, Your Honor, which shows that it occurs between approximately 0.2 and 0.4 milligrams per kilogram, which is approximately 20 to 40 milligrams of Midazolam in a 220-pound adult. As the state points out, it's not 100% specifically identified where exactly the ceiling effect occurs, but it's generally understood to occur in the 20 to 40 milligram range. Even the state's expert, Dr. Antonini, admitted that he had seen of a ceiling effect in approximately that dose. So what the ceiling effect means is that even though the Arkansas protocol calls for a massive 500 milligram dose of Midazolam, that's in effect not any different than giving a 20 to 40 milligram dose. It's not the case where if a little bit of Midazolam sedates you and relaxes you, that a lot of it must really knock you out. A little bit of it sedates and relaxes you. A lot of it has exactly the same effect because of the ceiling effect. So the massive dose that is repeatedly pointed to is not meaningfully different than a 20 to 40 milligram dose. What does the time frame of this particular procedure, how does that play into it? In other words, it would be one thing to use Midazolam for maintaining anesthesia for an extended period of time for a surgery or procedure, whereas these executions take really just a few minutes. Does that play into how effective Midazolam can be in serving the purpose that the state intends it to serve? It does, Your Honor. The specific name of the study is escaping me. I believe it's in our briefing. But there is evidence that between the four and eight minute mark, the effect of Midazolam may start to wear off. And as you know, there's a five minute delay between when the Midazolam is injected, when the consciousness checks are performed, and the next drugs are injected. So in five minutes, which is between that four and eight minute mark, Midazolam is already starting to lose its effect. What if the second drug were to be injected before that period of time, let's say within four minutes? What does the record show about its effectiveness then? So the record, pointing to the Russell study in particular, shows that in approximately three quarters of patients that Midazolam does not render them unaware, regardless of the specific time. So that study, your Russell study, your tourniquet study, the arm, that one applies regardless of how long the person is intended to be insensate. Correct. Russell, particularly in view of the those three. Counsel, does the quantity of Midazolam administered affect the time before it starts to wear off? You said four to six minutes. Does the quantity affect how long it takes for that to start fading or subsiding? My understanding, your honor, is no, that it does not. With the ceiling effect, anything above the ceiling effect dosage, which would be in that 20 to 40 milligram range, I do not believe that the quantity would affect the time. But in any event, the Russell study shows that no matter what time you're looking at it, Midazolam is simply, there's up to a 75% chance that Midazolam simply cannot render a patient or an inmate unaware of the pain of the second and third drugs. Mr. Freeman, of the states that do have the death penalty and are executing prisoners, do you know what number or what percentage are using this three drug protocol with Midazolam as the first one? Your honor, I don't know the specific number on that. We'd be happy to submit a 28-J letter on that if it would be helpful. I know it is, as you mentioned, it is several. It is certainly not all. There are others that use, for example, single drug pentobarbital. The execution, I don't know the specific number. If we were to rule in your favor, would we be the first court to look at a factual record and determine that Midazolam is not sufficient to render the person insensate for the role of the first drug? Would we be the first court? Yes, that's our understanding, your honor. There's good reason for it here because there is a very specific and detailed scientific record here. The studies I just went into on the isolated forearm technique and also on the ceiling effect that we don't have any evidence that those were at issue in those other cases. The second key difference, I'll turn briefly to the second problem of the analysis. Before you go to the second, could I follow up on your first one? You said that the other cases did not present evidence about the ceiling effect. Is that correct? Not altogether, but the level of detail and the specific studies and the specific testimony we have here would not have been in those other cases. I don't believe it's true that no other cases ever presented any evidence on the ceiling effect, but the depth and conclusiveness to which we have presented that evidence is unique here. Let me just be clear that what's new in this case is the isolated forearm technique evidence and additional evidence on the ceiling effect. Is that a fair summary? On the first problem, that's correct, your honor. A critical thing, though, is the second problem. Our evidence on the second problem is substantially more detailed than any that has been provided in any of these other cases. The Bayes Gossip Test is inherently comparative. If you don't have evidence of the alternative that is substantially likely to reduce the amount of pain, you have nothing to compare that first problem against. The new evidence that we have presented on the second problem, we would say it has a huge impact on the first problem as well because it's an inherently comparative analysis. Wait a minute, I don't understand that argument, Mr. Freeman. As I understand the law, you have to show sure or very likely to suffer severe pain in order to satisfy the first prong regardless of how good the second alternative is. Do you have a different understanding of the law? No is the short answer, your honor. Okay, go ahead then. I just want to clarify that because I think that's counter to your point that it's inherently comparative. The first prong is an independent threshold that regardless of the quality of the alternative, but go ahead if you want to talk about the alternative. Yes, so the amount of pain that is inflicted, so as the Supreme Court has recognized the death penalty has been held to be constitutional, so therefore there must be a constitutional means for carrying it out. When you're looking at the first prong, where it is necessarily comparative is what is the next best alternative? Some degree of pain has to be acceptable under the constitution. The degree of that pain to be tolerated must be evaluated in view of the next best alternative, and that is what I mean by it's a comparative exercise, your honor. This case on the second prong is a lot different than the Supreme Court's recent case in Bucklew in 2019. In that case and in many others, the inmates have put on only cursory proof about the proposed alternative, but here we put on detailed evidence about the availability of the firing squad. Expert testimony about how specifically it can be done, evidence from the Utah and United States Army protocols about how it's been done in the past, evidence from two witnesses in Utah with the Utah Department of Corrections who have participated in and have knowledge of how Utah did the firing squad in 2010, evidence about the qualifications of riflemen in Arkansas, evidence about Arkansas's ability to construct any facilities or tools that need to be used in firing squad, and perhaps most of all, the director of the Arkansas Department of Corrections after speaking to Utah about the firing squad admitted that it could in fact do it if it needed to. So there can't be any meaningful question here that the firing squad is an available alternative to Arkansas. The question is whether it substantially reduces a risk of pain inherent in the Midazolam Protocol. How many plaintiffs are a part of this in total? I believe the number is 12 now, your honor. 12. So in essence, the argument is that each one of the 12 is proposing a firing squad as the alternative? That's correct. So 12 people would be asking the state of Arkansas to use the firing squad? That's correct, your honor. And there's also, as noted towards the end of our briefing, there's a second issue relating to a that's another alternative, but the primary thrust is related to the firing squad, your honor. And maybe I'm getting ahead of myself, but as you think about 12 individual people here, would this, if the courts were to rule in your favor and say, yes, that there is a substantial severe risk of pain for Midazolam Protocol, do the firing squad, would that it is a new, it would be something new for Arkansas. So you wouldn't know exactly how it would be laid out. Would that preclude any kind of argument that that was an 8th Amendment violation? I don't believe it would. I don't believe it would preclude it legally as one would imagine that the plaintiffs would need to be very, you know, be very cognizant of things that had been said in this case, but I don't believe it would, it strictly can preclude it, your honor. I just very, very briefly. You mean if you win here on the grounds that you've just advanced, you could file another lawsuit that says the firing squad is unconstitutional because it involves a severe risk of pain and pentobarbital is better. Is that what you're saying? In effect, yes, your honor, it would require the same showing that there is an alternative that on the record here, your position here, though, that the firing squad would eliminate a severe risk of pain or just that it also has a severe risk of pain, but it's not as great a risk as midazolam. It would substantially reduce a severe risk. There could be some discomfort in some minor pain associated with the firing squad. In the interest of time, I won't get into Dr. Williams' testimony in detail, but that's on our briefing. A key factor here, though, is that any pain and discomfort that would be suffered would be only for a matter of a few seconds at most, and that's in stark contrast to the midazolam protocol in which the pain could last for minutes or more. The time is a very critical distinction here. The Constitution does not provide that any execution method must provide for a pain-free death, only that, again, this two-factor test. We would ask one more question before you reserve. Has any plaintiff actually submitted an affidavit or testimony stating that he would prefer execution by a firing squad over lethal injection, or is this all just legal argument from the lawyers? There is no affidavit from the plaintiffs, your honor. They are, of course, fully aware of the arguments we're making and are fully on board with everything that I'm advocating for here today. To conclude very quickly, we would ask this court to reverse the district court order to enjoin Arkansas from using the midazolam protocol. In a minimum, however, if this court should choose not to reverse the district court, it should revent to the district court in order to address the scientific proof that it failed to address below, and I'll reserve the remainder of my time. Thank you. All right, you may reserve the balance, but on our time, let me just see if there are any other questions before you stop. Judge Kelly, do you have anything further for Mr. Freeman? No, I don't. Judge Culbis? No, thank you. Okay, very well then. Mr. Jacobs, we'll hear from you. Thank you, your honor. May it please the court. My name is Dylan Jacobs, and I'm an assistant solicitor general for the state of Arkansas, and I represent the Appalachians. The eighth amendment prohibits states from foregoing one known readily available method of execution for another in order to cruelly super add pain, terror, or disgrace. The Supreme Court has never held that any state has done this, including with the three drug protocols like the one Arkansas uses here. Four years ago, this court sitting on bond reversed the district court's preliminary conclusion that the prisoners in this case were likely to prove that. On remand, after a discovery in trial, the district court concluded that the plaintiffs failed to meet their evidentiary burden, and its findings were not clearly erroneous. The district court correctly held that plaintiffs failed to meet either prong of the Bayes-Glossop test, and this court should affirm. First, plaintiffs failed to show that Arkansas's three drug protocol is sure or very likely to cause them severe pain. Their theory that a 500 milligram megadose of midazolam is incapable of causing pain is a theory. The district court correctly found that there is no scientific consensus on the dose of midazolam at which it might exhibit a sealing effect. Mr. Jacobs, on that point on the district court's finding, there is no consensus is what the district court said. But if you compare that order to the one that was issued, as you say, four years ago on the preliminary injunction, there were actually some credibility findings in assessing the testimony and the description of some of the studies that each party was submitting in support of their position. That's lacking in this order. Do we need more? Don't we need more to understand how the district court got to that conclusion? No, Your Honor. It's true that the district court didn't go into detail about any credibility determinations that it might have made. But that's simply because the evidence that the plaintiffs provided at this stage of the case in a trial other than preliminary injunction was insufficient to cross them over the evidentiary threshold in the first place. I think that defense could feasibly have rested its case after plaintiff's conclusion and the result would have been the same. As I understand it, one of the plaintiff's experts testified that there was indeed a ceiling effect. Compared to the 500 milligrams, it's fairly low, maybe 40. I think maybe counsel said 20. But if a court were to find that to be true, to be accurate, wouldn't that strongly indicate that the person would not be insensate for the administration of the next two drugs? Not on its own, Your Honor, because maybe at the preliminary injunction stage that would have been different. But after a trial, we've conducted four executions using this protocol and we have real world experience with how this works. We have the ADC conducting consciousness checks of every execution during that process, inducing very painful stimuli to each of these inmates. How painful was the stimuli? As I understood the consciousness check, that it wasn't painful. But tell me if I'm wrong. I thought it sort of went, progressed from sort of a soft touching to sort of some pinching. But what was the very strong stimuli? So by the end of the consciousness checks, Your Honor, you have the pinching of the earlobe, pinching the trapezius muscle on the back shoulder area, and touching an inmate's eyeball, rubbing the sternum. All of these things are what you'd expect to elicit an involuntary response. And particularly in pulse ox measurements and the testimony below, particularly with the ADC designee's testimony on that, the pulse ox readings were normal throughout and didn't begin dropping until the second and third drugs were administered, which is what you'd expect at that point. But if cardiac response, in particular, to these painful stimuli. So even if the district court had concluded or had found that there was a scientific consensus about this ceiling effect and the dazzling, that wouldn't have been enough to leave plaintiff's evidentiary requirements. And in fact, there is no scientific consensus. The district court was correct to not find that. Plaintiffs are relying primarily on a small handful of studies on a small handful of patients that are all, or at least in part, are quite old. And the Russell study in particular, contrary to the claim that nobody had this evidence before, the Russell study has been around for about 30 years now. Studies on this isolated form technique. But there are significant problems with studies like that for it to count as a scientific consensus. It was done on about 32 patients on procedures that took quite a bit longer than an execution would. I think the median procedure... Go ahead, Judge. Go ahead. I was going to ask what a consensus would be, because I'm sort of struggling with what were judges, not doctors or scientists, and to try to determine what... It's one thing to say people disagree, that experts disagree on where the ceiling effect may be. I think it's a different analysis to say there's a consensus. What do you think that means? What do you think a plaintiff would have to show here to reach what you are saying is sufficient? So I think first you'd have to study the effects using a reliable method. And we would dispute the IFT method is reliable for that purpose, being that it's simply a research tool and isn't something that's used in American clinical practice. And second, you would have to have more than a single study, which the Russell study is the only study that plaintiffs have presented which observes this IFT response on human patients at all. And we don't know if that would have been repeated with another study or studies that had more than just 32 patients. And third, I think you would have to have some sort of studies, if not at 500 milligrams, then at least closer above the clinical doses. All of the studies that plaintiffs put in the record about midazolam that were conducted on humans were done with clinical doses and not the 500 milligram mega doses that are used here. So it would have to be something like that to approach a scientific consensus that the court could rely on in concluding that midazolam... Was there some consensus though that to go up as close, you know, even near 500 milligrams was just not going to happen due to medical ethics? Yes, I think the consensus below was that a human test of 500 milligrams is unlikely to ever occur. That is true. So it's more of your first two positions or your stronger arguments for what makes a consensus than requiring someone to prove up something that I think all the doctors there submitted was just not going to happen. Well, and I don't want to say that it would absolutely take a 500 milligram study to count, but certainly something above the clinical range of doses. I think the highest dose of any of the studies that plaintiffs are relying on is 60 milligram equivalent for 100 kilogram human, which is the high end of clinical doses. Antonini testified that the type of study that you need to have escalating doses and, you know, perhaps, you know, 100 milligram equivalent dose would be the next one. And maybe that would be safe enough to happen, maybe not. But at the end of the day, the evidence isn't there, Your Honor. And again, in the absence of that scientific consensus, the plaintiffs could rely on experiential evidence, you know, real world happenings of using these as, you know, in an execution protocol. We have that in the record here. And as the district court found all the evidence indicated, there's no reason to think that anything went awry in that. And all these patients were insensate to pain and made no sort of pain response during the course of those executions. As to the second prong of the Bayes test, plaintiffs failed to show that the firing squad is a readily available alternative that would significantly reduce a severe risk of pain. And at the outset, it's important to note that the district court didn't even have to go on to analyze any of this because plaintiffs failed to meet their burden on the first prong of the test. Nevertheless, the district court was correct in finding that plaintiffs failed to establish that firing squad is a feasible alternative. Indeed, the testimony below was undisputed that an inmate would at least feel some amount of severe pain from the firing squad, or at least that it's very possible. Dr. Antonini and Dr. Williams, I think, both agreed that a high-powered rifle shot through a bone, such as a rib cage in the spinal cord, would be extremely painful. And whether or not that pain only lasts for a few seconds, the only evidence in the record of a method of execution being painful at all is the firing squad. As we've discussed, plaintiffs were unable to show that inmates would feel any pain under Arkansas' current three-drug protocol. Counsel, what if it was just a difference of length of time that the person was experiencing the pain? Would that be a reduction? So, in other words, if the district court found that Mdaz-Lam posed a substantial risk of severe pain during the protocol, and so did execution by firing squad, but firing squad was just a lot faster. So, Your Honor, I don't think there's any case law out there that discusses how we're supposed to quantify pain in the context of an execution, whether it's degree or length. And I don't think the court has to address that here, because we have, you know, on the one hand, you know, factual findings that are lacking as to Mdaz-Lam causing any pain. And we have, evidence supporting the notion that there's at least something. So, if there were a hypothetical case where you could demonstrate, you know, the same quantum of pain for longer, then perhaps that would be more viable. You know, again, the overall comparative standard of the Bayes-Glossop test is that the only explanation for a state choosing one method over another is simply to super add pain to the process. So, you have to cross that threshold. It wouldn't simply be, you know, a difference in length of time would be enough to establish an amendment claim. At this point, if the court has no further questions, then I will see the balance of my time. Judge Kelley, anything further? No, thanks. Judge Colvis? No, thank you. All right, very well. Thank you for your argument, Mr. Jacobs. Thank you. We would ask that the Court of Court affirm the argument. All right, Mr. Freeman, we'll hear from you and Rebeau. Thank you, Your Honor. A few quick points. Related to the scientific consensus regarding Midazolam. I point you first to the American Society of Anesthesiologists, a society of hundreds, if not thousands of anesthesiologists in the United States, has said that Midazolam should not be used on its own as a general anesthetic. A second point on consensus, looking at the FDA package insert for Midazolam, Appendix 489, it says that, quote, injectable Midazolam can also be used during maintenance of anesthesia for surgical procedures as a component of a balanced anesthesia regimen. A component, not on its own. Also says that, quote, effective narcotic premedication is especially recommended in such areas. Midazolam should not be used on its own to induce anesthesia. Pain relievers are a necessity when it is used for that purpose. Another key fact, in the state's brief, they don't actually point to a single scientific study of their own saying that our studies are wrong. They pick at the edges of the studies that appellants have put in, but they don't actually introduce any studies that substantially undercut the fundamental points made in the studies that there is, in fact, a scientific consensus, even if it may not be strictly required under the law. So, your honors, to conclude briefly, the law requires... Mr. Freeman, I do have one other question for you, and maybe it's in the record and I overlooked it, but did you propose adding a narcotic to the Midazolam, as you've said is done in the therapeutic settings? It did not specifically do that, your honor. One key limitation there would be the availability of that. Whether that could reduce pain, that's a question that hasn't been thoroughly analyzed because the availability issue could potentially be a limiting factor based on the lack of evidence. You mean availability from manufacturers who are willing to provide a narcotic for an execution? Is that what you mean by availability? Correct. That's correct, your honor. May I briefly conclude? Just 15 seconds. I see my time's up. 15 seconds. You may. Yes. So, we respectfully ask that this court reverse the district court's order, or at the very least, remand and order the district court to address the evidence and the scientific proof that it failed to address in its order. We would additionally ask this court to reverse the district court's denial of appellant's new trial motion. Thank you. Any other questions for Mr. Freeman? Okay, thank you very much to both counsel. The case is...